**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TESTWELL, INC. | ) | Case No. 09-22796 (RDD) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |

**TD BANK, N.A.'S (I) OBJECTION TO DEBTOR'S MOTIONS:**
**(A) FOR USE OF CASH COLLATERAL; AND (B) TO PAY**
**PRE-PETITION PAYROLL; AND (II) MOTION OF TD BANK, N.A.**
**PURSUANT TO SECTIONS 105 AND 362(D)(1) OF THE BANKRUPTCY CODE**
**TO LIFT THE AUTOMATIC STAY, OR, IN THE ALTERNATIVE,**
**PURSUANT TO SECTIONS 1112(b)(2) AND (4) OF THE BANKRUPTCY CODE**
**TO CONVERT DEBTOR'S CASE TO A CASE UNDER CHAPTER 7**

Of Counsel:
    Stanley L. Lane, Jr.
    Bernard Beitel
    Erik B. Weinick

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
230 Park Avenue
New York, New York 10169
(212) 661-9100

Attorneys for Plaintiff
TD Bank, N.A. as successor by merger to Commerce Bank, N.A.

1286588.1

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TESTWELL, INC. | ) | Case No. 09-22796 (RDD) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |

### TD BANK, N.A.'S (I) OBJECTION TO DEBTOR'S MOTIONS: (A) FOR USE OF CASH COLLATERAL; AND (B) TO PAY PRE-PETITION PAYROLL; AND (II) MOTION OF TD BANK, N.A. PURSUANT TO SECTIONS 105 AND 362(D)(1) OF THE BANKRUPTCY CODE TO LIFT THE AUTOMATIC STAY, OR, IN THE ALTERNATIVE, PURSUANT TO SECTIONS 1112(b)(2) AND (4) OF THE BANKRUPTCY CODE TO CONVERT DEBTOR'S CASE TO A CASE UNDER CHAPTER 7

TO:    THE HONORABLE ROBERT D. DRAIN
       UNITED STATES BANKRUPTCY JUDGE

TD Bank, N.A. (the successor by merger to Commerce Bank, N.A., referred to herein collectively as "TD Bank"), as secured lender to the debtor in the above-captioned case, Testwell, Inc. (the "Debtor"), respectfully submits this: (I) Objection to Debtor's Motions: (A) To Use TD Bank's Cash Collateral (Dkt. No. 4) (the "Cash Collateral Motion"); and (B) For An Order Authorizing the Payment of Pre-Petition Wages and Salaries (Dkt. No. 6) (the "Wages Motion", and together with the Cash Collateral Motion, the "Debtor's Motions"); and (II) Motion of TD Bank Pursuant to Sections 105 and 362(D)(1) of the Bankruptcy Code to Lift the Automatic Stay or, in the Alternative, Pursuant to Sections 1112(b)(2) and (4) to Convert Debtor's Case to a Case Under Chapter 7 (the "Lift Stay/Conversion Motion"). In opposition to the Debtor's Motions, and in support of TD Bank's Lift Stay/Conversion Motion, TD Bank states as follows:

# I.    **PRELIMINARY STATEMENT**

1.     Although the Debtor filed this case on May 13, 2009, in reality, the Debtor has been operating in a "de facto" Chapter 11 context since the end of October 2008 when it became the subject of a multi-count indictment by the Manhattan District Attorney (the "DA") arising out of allegedly falsified reports submitted by the Debtor with respect to materials tests, inspections and other services that the Debtor had been retained to perform. Now, after a New York State Judge specifically granted TD Bank (the Debtor's secured-lender) "lift stay" relief to foreclose on its collateral, and on the eve of a scheduled hearing in an already pending U.S. District Court action to consider relief that would have enabled TD Bank to begin the process of foreclosing on and liquidating its collateral, the Debtor seeks refuge in this Court to further delay its day of reckoning.

2.     The Debtor's latest forum shopping exercise is the culmination of a six-month effort by the Debtor to impede TD Bank from exercising its rights as a duly perfected Article 9 secured creditor in respect of Debtor's defaulted loan obligations. It should not be countenanced. Rather, this Court should deny the Debtor's Motions which seek broad, unspecified and unjustified authority to further dissipate TD Bank's cash collateral to (among other things) pay pre-petition wages and salary. Such relief is being sought despite the fact that the Debtor is incapable of providing TD Bank with the requisite adequate protection for the Debtor's continued use of TD Bank's cash collateral. As a result of the foregoing, and as more fully explained below, this Court should also enter an Order granting TD Bank lift stay relief (similar to the relief it recently received in the State Court) or, in the alternative, converting this case to a case under Chapter 7 to permit a Chapter 7 Trustee to conduct and oversee the liquidation of

Debtor. Among other things, the Chapter 7 Trustee should be granted the authority to investigate the Debtor's fraudulent activities and the conduct of its business, in addition to proceeding with the liquidation of Debtor's assets (before they decrease in value even further) for the purposes of generating sufficient proceeds to satisfy TD Bank's secured claims and the claims of the Debtor's unsecured creditors (who include the DA, whose $110,000,000 Forfeiture Action against the Debtor and twelve of its employees -- who are also criminal defendants -- has been pending since October 2008).

## II.    FACTUAL BACKGROUND

3.     Since 2003, TD Bank has been the secured working capital lender to the Debtor, and holds a duly perfected first-priority lien and security interest in substantially all of the Debtor's assets (the "Collateral"). The Debtor is in default of its obligations to TD Bank under various loan documents (the "Loan Documents")[1] executed by and among TD Bank and the Debtor between 2003 and 2007. As a result, there is presently due and owing from the Debtor to TD Bank the principal amount of $3,920,165.55, together with interest accrued and accruing. (The approximate amount of this outstanding indebtedness is admitted by the Debtor at ¶ 11 of its Cash Collateral Motion.)

**A.    The Debtor**

4.     The Debtor is a certified testing company that conducts material testing, inspection and quality control services for large-scale construction projects throughout the Tri-

---

[1] All materials and documents referenced in this brief will be filed by TD Bank as an omnibus exhibit supplement.

State area (such as the new Yankee Stadium, the Freedom Tower and the expansion of John Jay College).

## B.  The Indictment of the Debtor and the Forfeiture Action

5.      On or about October 30, 2008, the DA announced a multi-count indictment (the "Indictment") of the Debtor, its founder, chairman and sole shareholder, Reddy Kancharla ("Kancharla"), and six other employees of the Debtor arising out of allegedly falsified test reports submitted by the Debtor with respect to material tests, inspections and other services that the Debtor had been retained to perform at the previously mentioned projects and at numerous other construction sites.[2]  At the same time, the DA also commenced a $110,000,000 asset forfeiture action (the "Forfeiture Action", N.Y. Co. Index No. 08-402674) against the Debtor under NYCPLR 13-A in the Supreme Court for the State of New York, County of New York (the "State Court"), and obtained a temporary restraining order (the "TRO") against any disposition of the Debtor's assets on October 28, 2008.

6.      Since the commencement of the Forfeiture Action, TD Bank has been stayed from enforcing its rights as a secured creditor, and the Debtor has been permitted to operate by using TD Bank's cash collateral under a series of State Court Orders entered with the DA's consent for the intended purpose of preserving the value of the Debtor's estate.  However, as first predicted

---

[2] Among other things, the Indictment charged the Debtor, Mr. Kancharla, and six of the Debtor's other employees, with multiple counts of Enterprise Corruption and Grand Larceny.  Five of the Debtor's other employees were separately indicted on similar charges arising from the same series of events, but were not charged with Enterprise Corruption.  The Indictment was issued after a series of comprehensive investigations into the Debtor's activities by the Inspector General for the Dormitory Authority of the State of New York, the New York City Department of Investigation, and the Inspector Generals of the Metropolitan Transportation Authority of the State of New York and the New York City Construction Authority, all in addition to the DA.

- 4 -

by TD Bank in November 2008, the continued operation of the Debtor's business has resulted in a substantial dissipation of -- rather than the preservation of -- the Debtor's assets and TD Bank's Collateral.

## C. The Debtor's Post-Indictment Losses and Activities

7.     Over the past six months, the Debtor has incurred operating <u>losses</u> that have averaged more than $315,000 per month.  During this same period, the Debtor's aggregate operating loss has amounted to more than $1,890,000, and its monthly revenues have declined from as much as $1,600,000 per month before the Indictment to less than $450,000 at present. The Debtor has consumed millions of dollars of TD Bank's Collateral in a futile effort to reverse its downward spiral, resolve its pressing criminal issues, and compensate for the scaling back or termination of many of its ongoing projects as caused by both the current economic downturn (and the effects of the Indictment), all without success.

8.     In mid-March, 2009, with the approval of the State Court and the DA, the Debtor retained an independent consultant to assist it in trying to rehabilitate its relationship with the New York City Department of Buildings ("DOB") and to attract new business from major real estate developers and builders.  That consultant quit after only thirty days because, upon information and belief, he was neither able to generate any new business for the Debtor nor make any progress with DOB concerning a renewal of the Debtor's concrete testing license (which is scheduled to expire on June 18, 2008).[3]  Further, upon information and belief, the DOB has

---

[3] Following the Indictment, DOB suspended Debtor's concrete testing license.  The license was reinstated for the time being by the Judge in the Foreclosure Action, based on procedural grounds relating to the process followed by DOB in effectuating the suspension.

already advised the Debtor that its New York City concrete testing license will not be renewed by DOB when it expires on June 18, 2009. The non-renewal of its concrete testing license will prevent the Debtor from performing a critical function of its business operations in its main market, New York City.

9. On March 17, 2009, after the Debtor's aggregate losses following the Indictment had already exceeded $1,230,000, an agreement was reached in the Forfeiture Action to permit the Debtor to continue to use TD Bank's Collateral to operate its business for an additional thirty days, on the condition that all further requests for spending authorization by the Debtor would be accompanied by a budget reflecting the Debtor's ability to operate at at least a break-even level over the time period covered by such requests.[4] Thereafter, the Debtor continued to operate for the entire agreed thirty-day period, and <u>all</u> payroll obligations accrued by the Debtor during that period were satisfied. However, despite the Court's mandate that the Debtor demonstrate that it could operate at a break-even level as a condition of any further funding, the Debtor managed instead during the thirty days to lose yet another approximately $375,000.[5]

10. As a result of these events, by mid-April 2009, the DA had arrived at the same conclusion that TD Bank reached last fall -- namely that the Debtor could not continue as a viable business entity. Accordingly, last week the DA presented an Order (the "TD Bank Lift Stay Order") for entry in the Forfeiture Action that vacated the TRO to the extent of permitting

---

[4] As part of this agreement, the Court authorized TD Bank to have Ronald R. Fink (an accountant, lawyer and Certified Turnaround Professional retained by TD Bank) "on site" at the Debtor's premises, monitoring its business operations for TD Bank and the DA.

[5] The Debtor's total operating loss for the period March 1, 2009 through April 30, 2009 amounted to approximately $660,000, and that is without taking into account over $180,000 in payroll obligations that accrued during the last two weeks of April, but were not payable by the Debtor until May.

- 6 -

TD Bank to pursue all of its remedies (as a secured creditor) against the Debtor. That Order was entered by the State Court on May 5, 2009.

11.     On March 9, 2009, TD Bank filed its First Amended Complaint in an action against the Debtor and various guarantors that TD Bank had commenced in the United States District Court for the Southern District of New York, Case No. 08-cv-11249 (LTS) (the "District Court Action"). In the District Court Action, TD Bank sought the entry of judgment against Debtor and several non-Debtor guarantors (including Mr. Kancharla) for the outstanding sums owed by the Debtor to TD Bank under the Loan Agreements. After entry of the TD Bank Lift Stay Order, TD Bank moved in the District Court Action on May 11, 2009 for the appointment of a Receiver pursuant to Fed. R. Civ. P. 64 and 66 and Articles 63 and 64 of the NYCPLR, and for Injunctive Relief to enable it to foreclose on its Collateral. That motion was scheduled to be heard on May 14, 2009, but was pre-empted by the Debtor's filing of this Bankruptcy Case on May 13, 2009.

**D.     The Debtor's Indebtedness to TD Bank**

(1)     The 2003 Loan Agreement

12.     On October 28, 2003, the Debtor and TD Bank entered into a Loan and Security Agreement (together with any amendments or modifications thereto and all documents executed in connection therewith, the "2003 Loan Agreement") under which TD Bank agreed, from time to time, and subject to the terms and conditions contained therein, to make up to $5,000,000 available to the Debtor according to a formula set forth in the 2003 Loan Agreement.

13.     In connection with the 2003 Loan Agreement, the Debtor executed a promissory note (the "2003 Note") in the amount of $5,000,000 or, if less, the unpaid balance of all obligations under the 2003 Loan Agreement.

14.     In order to secure its obligations under the 2003 Loan Agreement, the Debtor granted TD Bank a first-priority security interest in substantially all of the Debtor's assets, including, without limitation, all of the Debtor's documents, deposit accounts, inventory, equipment, goods, fixtures, and account receivables and all proceeds thereof. (*See* Section III of 2003 Loan Agreement.) TD Bank duly and properly perfected its security interest.

15.     The Debtor committed multiple defaults under the 2003 Loan Agreement. However, at the Debtor's request TD Bank agreed to forebear from enforcing its default rights and remedies under the 2003 Loan Agreement and entered into a Forbearance and Modification Agreement (the "Modification Agreement") dated as of March 28, 2006.

16.     Pursuant to the terms of the Modification Agreement, the principal balance then outstanding under the 2003 Loan Agreement ($4,600,000) was converted to a term loan (the "Term Loan") subject to the terms and conditions of the 2003 Loan Agreement which remained in full force and effect and was ratified and confirmed by the Debtor in the Modification Agreement. (*See* Sections 3 and 8 of the Modification Agreement.)

(2)     The 2007 Loan Agreement

17.     On September 28, 2007, the Debtor and TD Bank entered into a second Loan and Security Agreement (together with any amendments or modifications thereto and all documents executed in connection therewith, the "2007 Loan Agreement", and together with the 2003 Loan

Agreement as amended, the "Loan Agreements") under which TD Bank agreed, from time to time, and subject to the terms and conditions thereof, to make up to $2,500,000 available to the Debtor according to a formula set forth in the 2007 Loan Agreement.

18.     In order to secure the Debtor's obligations under the 2007 Loan Agreement, the Debtor granted TD Bank a further first-priority security interest in substantially all of the Debtor's assets, including, without limitation, all of the Debtor's documents, deposit accounts, inventory, equipment, goods, fixtures, and account receivables and all proceeds thereof. (*See* Section III of 2007 Loan Agreement.) TD Bank duly and properly perfected this second security interest.

(3)     Impact of the Indictment on the Debtor's Obligations to TD Bank

19.     The issuance of the Indictment and the TRO at the end of October 2008 violated multiple provisions of the Loan Agreements and constituted Events of Default under several sections including, without limitation, Sections 8.1(p) and 8.1(t) of each Loan Agreement.

20.     Under Section 8.1(p) of the Loan Agreements, an Event of Default was defined to include "any indication or evidence received by [TD Bank] that reasonably leads it to believe that [the Debtor] may have directly or indirectly been engaged in any type of activity which, would be reasonably likely to result in the forfeiture of any material property of [the Debtor] to any government entity, federal, state or local." The issuance of the Indictment and the entry of the TRO (which was rendered in connection with the Forfeiture Action) each clearly constituted an Event of Default under this section of the Loan Agreements.

21.     Pursuant to Section 8.1(t) of each Loan Agreement, an Event of Default would also occur if there were any change in the Debtor's financial condition which, in TD Bank's opinion, would be reasonably likely to have a material adverse effect upon the Debtor's business, financial condition, prospects, operations or its ability to repay its indebtedness to TD Bank. There is no doubt that the Indictment and the TRO were reasonably anticipated by TD Bank as likely to cause such a material adverse effect.  (In fact, in the ensuing months the Debtor's business has gone into free fall as its volume declined dramatically, and the material adverse effect on the Debtor's financial condition and economic performance, triggered in substantial part by the Indictment and criminal prosecution, continued unabated.)

22.     By separate letters dated November 5, 2008, TD Bank advised the Debtor that certain "Specified Events of Default" had occurred, including, without limitation, the Indictment and TRO.  Pursuant to such letters, TD Bank also (i) notified the Debtor that, as a result of the occurrence of the Specified Events of Default, all outstanding Obligations (as defined in the Loan Agreements) were immediately due and payable, and (ii) demanded immediate payment thereof, in each instance in accordance with the relevant Loan Agreement and other Loan Documents.

23.     The Debtor failed to repay the Obligations or otherwise cure the Events of Default specified in TD Bank's notice.  Indeed, it is readily apparent that the events of the past six months continue to have a "material adverse effect" upon the Debtor's operations such that the Debtor is no longer a viable business entity.

24.    As of the date of hereof, the principal amount of $3,920,165.55, together with interest accrued and accruing, remains due and owing from the Debtor to TD Bank under the Loan Agreements.[6]

(4)    Injury to TD Bank

25.    Since entry of the TRO on October 28, 2008, the Debtor has managed to use the Forfeiture Action as a lifeline for continuing its business (entirely at TD Bank's expense), ostensibly for the purpose of preserving its assets.  That purpose, however, has not been achieved as the Debtor's business operations have continued to lose money at an ever increasing rate. Indeed upon information and belief, the Debtor lost more than $445,000 in April 2009 alone (and that was despite deferring payment of more than $466,000 of additional current expenses that the Debtor sought, but did not receive, permission from the State Court to pay in April).  In all, the Debtor appears to have incurred operating losses from November 2008 through the end of April 2009 that totaled more than $1,890,000 million.  During this same period, the Debtor apparently managed to consume almost $6,500,000 of TD Bank's Collateral, and the accounts receivable pool that forms the principal component of TD Bank's Collateral has decreased by more than $2,900,000.  Further, there does not appear to be *any* prospect, let alone a *reasonable* prospect, that the Debtor will be able to reverse its downward spiral at any time in the foreseeable future.

---

[6] The Debtor is also the guarantor of a $2.9 million first priority commercial mortgage that TD Bank holds on the Debtor's Ossining, New York headquarters property, title to which is held by two non-debtor limited liability corporations controlled by Mr. Kancharla.  The indebtedness owed to TD Bank on the commercial mortgage is not a subject of the District Court Action that has been stayed as against the Debtor only by the Debtor's Chapter 11 filing.  In support of its motion, the Debtor claims that a recent appraisal of the mortgaged premises obtained by TD Bank reflects $1,000,000 of equity in the property above TD Bank's first mortgage.  That statement by the Debtor is unfounded and untrue.

26.     Accordingly, allowing the Debtor to continue to live off of TD Bank's cash collateral can serve no purpose other than to further deplete the Collateral, thereby prejudicing whatever prospects the Debtor has left to pay the secured obligations due and owing to TD Bank and, thereafter, the obligations owed by the Debtor to its other creditors (including the DA as the "Claiming Authority" in the Forfeiture Action).

## III.     ANALYSIS

### POINT I

#### The Cash Collateral Motion Should Be Denied

27.     The Debtor's Cash Collateral Motion should be denied because despite the Debtor's conclusory allegations to the contrary: (a) TD Bank will not be adequately protected; and (b) whether TD Bank is over-collateralized cannot yet be determined.  Thus, the Debtor cannot meet its admitted burden of proof to show adequate protection, and the relief sought by Debtor should not be granted.

28.     As correctly noted in the Cash Collateral Motion, Section 363(c)(2) of the Bankruptcy Code governs a debtor's use of cash collateral.  Pursuant to that section, before a Bankruptcy Court may approve a debtor's request to use cash collateral (absent the consent of the entity with an interest in such cash collateral (in this case, TD Bank)), the Court must conclude that the creditor with an interest in the cash collateral (here, again, TD Bank), is being adequately protected by the debtor.

29.     In fact, this Debtor has been operating since November 1, 2008 under a de facto cash collateral regime with the result that Debtor has incurred during this period more than

$1,890,000 in operating losses, has consumed almost $6.5 million of TD Bank's cash collateral, and has seen the pool of accounts receivable that comprise the single largest component of TD Bank's Collateral for Debtor's operating loans reduced by more than $2,900,000 through April 30, 2009.[7]

30.     Adequate protection, as the term is used in Section 363, is defined in Section 361 of the Bankruptcy Code. "The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for." Sharon Steel Corp. v. Citibank (In re Sharon Steel Corp.), 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) (citations omitted). Section 361 specifies three examples of adequate protection: (1) periodic cash payments; (2) providing additional or replacement liens; or (3) other relief that will result in the "indubitable equivalent." 11 U.S.C. § 361. The debtor has the burden of affirmatively proving that the creditor is adequately protected. 11 U.S.C. § 363(o); see Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994).

---

[7] Debtor notes in support of its Cash Collateral Motion that there is presently a cash balance on hand in the Debtor's operating account at HSBC Bank approximately $1.2 million. That balance has been accumulated in large part as the result of the Debtor's deferral of more than $466,000 of expenses that have accrued since April 1, 2009, and the refusal by the State Court and the DA to authorize further payroll expenditures beyond the thirty-day period agreed to in the Forfeiture Action on March 17, 2009. In addition, it is worth noting that at the time the TRO was first served on TD Bank, the Debtor had cash balances of more than $589,000 in its operating and payroll accounts at TD Bank. As a result of Orders issued in the Forfeiture Action, all of these funds, together with another approximately $318,000 in collateral proceeds deposited by the Debtor with TD Bank after the TRO (and before the Debtor began diverting its receivables collections to HSBC Bank) were required to be disbursed by TD Bank during November and December 2008 to pay various unsecured obligations of the Debtor in prejudice to TD Bank's rights as a first-priority secured lienholder.

31.     The constitutional underpinnings of security interests and adequate protection are well developed in case law and legislative history.   For over sixty years, the courts have recognized that the security interests possessed by a secured lender constitute "property", and are thus accorded protection by the Takings Clause of the Fifth Amendment.   "[S]ecurity interests are 'property rights' protected by the Fifth Amendment from public taking without just compensation;   Wright v. Union Central Life Ins. Co., 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940), the Bankruptcy Court cannot allow the secured interest to be threatened by improper use of cash proceeds."   In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984).

32.     In United States v. Security Indus. Bank, 459 U.S. 70, 103 S. Ct. 407 (1982),  the Supreme Court rejected the debtors' contention that a congressional enactment, i.e., the Bankruptcy Code, was not subject to scrutiny under the Fifth Amendment's Takings Clause. While finding that the enactment of the Bankruptcy Code was a "rational exercise of Congress' authority," the Court nonetheless noted the constitutionally mandated limitations on governmental power, and held that the "bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation.  Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S. Ct. 854, 79 L.Ed. 1593 (1935)."   103 S. Ct. at 410. Categorizing the property right of a secured "creditor in the collateral" as a "traditional property right",  Security Indus. Bank also rejected the government's contention that an interest in collateral was merely entitled to the same protection afforded to a general unsecured contract claim. 103 S.Ct. at 411.

33.     Indeed, the legislative history of sections 361 and 506 of the Bankruptcy Code reflect Congress' awareness and sensitivity to the fact that the rights of a secured party warrant heightened scrutiny and protection.  As articulated in the legislative history to section 361: "Secured creditors should not be deprived of the benefit of their bargain" H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 338-40 (1977).  Likewise, the purpose of Section 506 of the Bankruptcy Code is "to give the court appropriate authority to ensure that collateral or its proceeds is returned to the proper secured party" H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 382-83 (1977).  Given this constitutional and statutory framework, it is clear that acceding to the Debtor's Cash Collateral Motion would unduly prejudice TD Bank.

34.     Moreover, the existence of an equity cushion (even if the Debtor could sustain its burden of proof, and TD Bank is prepared to submit evidence at an immediate hearing that the Debtor cannot presently meet this burden of proof)[8] cannot alone constitute adequate protection. Sharon Steel Corp. v. Citibank (In re Sharon Steel Corp.), 159 B.R. at 169.  In In re Sharon Steel Corp., despite the existence of an apparent equity cushion on the date of the hearing, the Court denied the Debtor's request for use of cash collateral, reasoning:

> We believe it improper to look at the valuation of assets in a vacuum. While the present value of the debtor's assets may be sufficient to constitute adequate protection, a debtor's future operational plans may result in a rapid deterioration of the collateral.  Where an equity cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection. Id.

---

[8] Whether or not an equity cushion exists will in large part be determined by the ultimate collectibility of approximately $8,900,000 of the Debtor's accounts receivable that are more than 150 days past due and cover the rendition of services by the Debtor during the period covered by the Indictment.  (In fact, approximately one-half of all of Debtor's accounts receivable are more than one year past due.)

35.     As in <u>Sharon Steel,</u> in addition to the small equity cushion that the Debtor alleges, here the Debtor has not demonstrated its ability to operate profitably.  Therefore, whatever equity cushion may exist will continue to deteriorate during the pendency of this case, as it has been deteriorating in the months leading up to the filing of the case during which, as set forth above, the Debtor operated in a state of "de facto" bankruptcy.

36.     This Debtor also faces the insurmountable obstacle posed by DOB's stated intention not to renew the Debtor's testing license, and the daunting challenge of overcoming the loss of its business stemming from the Indictment.  In addition, while the Debtor has finally made an attempt in connection with its Motion to propose a budget for its further use of TD Bank's cash collateral through the end of August 2009, that budget projects still <u>additional</u> operating losses aggregating <u>more than $557,000</u> (on top of the more than $1,890,000 in losses that the Debtor has already incurred since November 1, 2008 -- all of which losses have been funded through the Debtor's unfettered use of TD Bank's cash collateral).

37.     It is clear, therefore, that TD Bank is not adequately protected, and that, as such, the Court must deny the Debtor's request for any further use of TD Bank's cash collateral.

## POINT II

### <u>The Debtor's Wages Motion Should Also Be Denied</u>

38.     The Debtor's Wages Motion should also be denied because (like the Debtor's Cash Collateral Motion), it too is premised on the faulty notion that the Debtor is capable of continuing its business as a viable enterprise -- a conclusion already rejected on the strength of Debtor's six-month track record by both the DA and the State Court Judge in the Forfeiture

Action, both of whom finally concluded after May 1, 2009 that "enough is enough." As described above, because the Debtor has no realistic hope of continuing its business, the sole justification offered by the Debtor for using TD Bank's cash collateral to pay its employees -- maintaining their goodwill -- is of no import. Indeed, the Debtor was on notice as early as March 17, 2009 that additional wage payments would not be permitted if the Debtor could not demonstrate an ability to live within its means. While the Debtor only now professes an intention to implement phased staff reductions to levels consistent with its diminished business activity, that is a process that the Debtor should have begun months ago as it found itself transitioning from a business with up to $20,000,000 a year in revenues to the $6,000,000 a year enterprise that it has become. The Debtor having been adequately warned of the consequences that would flow from its failure to act responsibly, the burden of that failure should not now be hoisted upon TD Bank (which, over its continuing objection, has already paid with its Collateral for the Debtor's unwillingness to show required levels of fiscal restraint).

39.    Nor can the Debtor demonstrate that any significant percentage of the employees it seeks to have paid are necessary to the conduct of an orderly wind-down of the Debtor's operations for the purpose of preserving the Debtor's assets, rather than further squandering them. In fact, TD Bank, which remains prepared to fund payroll for those few employees who are necessary for the conduct of an orderly wind-down of the Debtor's business operations, is prepared to offer evidence that the continued operation of the Debtor by all employees whose wages the Debtor seeks permission to pay, will only serve to further decrease the value of the Collateral, rather than enhance and preserve it. Therefore, for the reasons set forth in TD Bank's Lift Stay/Conversion Motion, TD Bank avers that it should be charged with the ongoing "care"

of the Debtor's assets, so that they may be liquidated for the benefit of TD Bank (the secured lender), the Debtor's other creditors and the Debtor's estate.

## POINT III

**Either TD Bank Should Be Granted Lift-Stay Relief to Proceed
with the Liquidation of Its Collateral in the District Court Action or
This Case Should Be Converted to a Case Under Chapter 7
and a Chapter 7 Trustee Appointed to Liquidate the Debtor's Assets**

**A.      TD Bank's Lift Stay Motion Should Be Granted**

40.      Pursuant to Sections 105 and 363 of the Bankruptcy Code, TD's Lift Stay Motion should be granted because TD Bank's Collateral is continuing to lose value, it is unclear at this time whether TD Bank is over-secured, and the Debtor has already had ample opportunity over the past six months (and under the supervision of other Courts) to reorganize its business and preserve its value for itself and its creditors.   Accordingly, in order to prevent the further diminution in the value of its Collateral, TD Bank should now be permitted to proceed with the foreclosure of its Collateral in the District Court Action, consistent with the determination recently reached by the State Court Judge in the Forfeiture Action when he determined, after six months, to put an end to the Debtor's use TD Bank's cash collateral to fund the Debtor's ongoing business losses.

41.      The Debtor has had over six months to demonstrate its ability to operate a viable business, but has failed to do so, significantly devaluing TD Bank's Collateral in the process.   As noted above, the Judge in the Forfeiture Action recently lifted the TRO specifically to permit TD Bank to liquidate its Collateral; and TD Bank's application for such relief to the District Court is what precipitated Debtor's Chapter 11 filing.

42.  "Cause" exists in this proceeding for the Court to lift the automatic stay and allow TD Bank to foreclose its liens and realize upon its Collateral in the estate because TD Bank's interests in the estate are not being adequately protected.   In order to grant a motion to lift the automatic stay, a court need only determine that "the party seeking relief has a colorable claim to the property of the estate."  Grella v. Salem Five Cent Savings Bank, 42 F.3d 26, 32 (1st Cir. 1994).  TD Bank has established more than merely a "colorable claim" because:

    a.  TD Bank is indisputably the Debtor's senior-secured lender;

    b.  TD Bank is not adequately protected;

    c.  the Debtor (faced with TD Bank's secured claims, hundreds of thousands of dollars in unsecured wage and vendor claims, and the DA's $110,000,000 forfeiture claim) has no equity in the property; and

    d.  the property is not necessary for an effective reorganization because it is clear that there can be no effective reorganization of the Debtor.

id. at 31 citing 11 U.S.C. § 362(d).

43.  It is appropriate given the summary nature of a lift stay proceeding, that such relief be afforded to TD Bank, especially because the Debtor cannot credibly assert that it is capable of continuing to operate as a going concern given the impending loss of its license from the DOB, as well as the Indictment (no matter how much false optimism the Debtor may have about its chances for promptly having all of the charges against it dismissed).

44.  "Because a secured creditor risks losing the benefit of its security interest if it is unable to foreclose against the property, the Bankruptcy Code permits a creditor to seek such relief by filing a motion for relief from the automatic stay under 11 U.S.C. § 362(d)."  Nantucket Investors II v. Cal Fed. Bank (In re Indian Palms Assocs., Ltd.), 61 F.3d 197, 206 (3d Cir. 1995).

It is also appropriate to lift the stay in favor a creditor where it is unreasonable or unlikely that a Debtor will be able successfully to reorganize. In re Belmont Realty Corp. 124 B.R. 422 (Bkrtcy.D.R.I.,1991).

45.     Sections 362(d)(1) and (d)(2) of the Bankruptcy Code describe alternative means by which a party may seek relief from the automatic stay. Specifically Section 362(d)(1) provides that a party in interest may seek relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party . . ."; whereas section 362(d)(2) provides that the Court shall grant relief from the automatic stay if the debtor does not have equity in the property and the same is not necessary for an effective reorganization. 11 U.S.C. § 362(d).

46.     Courts have interpreted the disjunctive statutory construction of Sections 361(d)(1) and (d)(2) to mean that a creditor (such as TD Bank) may demonstrate entitlement to relief under either statute without regard to the strength of its case under the other provision. See Nazareth Nat'l Bank v. Trina-Dee, Inc., 731 F.2d 170, 171 (3d Cir. 1984) (after creditor prevailed under Section 362(d)(2), debtor's adequate protection arguments became moot). Although different, the factors to be considered under either Section are similar, including lack of equity and lack of a reasonably foreseeable plan of reorganization. In re Gulph Woods Corp., 84 B.R. 961, 972 (Bankr. E.D. Pa. 1988).

47.     The test that the Court must employ to determine whether "cause" exists for relief from automatic stay is whether the secured creditor will realize the indubitable equivalent of the creditor's interest in the property, which requires the debtor to prove that the secured creditor "will be sure of being paid, and that the payments to the secured creditor [are] as good as are

1286588.1

provided for by the agreement between the creditor and the debtor." In re Rhodes, 38 B.R. 63, 65 (D. Vt. 1984).

48.     This Debtor can demonstrate no realistic prospects for a successful reorganization as it is about to lose its license to conduct construction safety testing in New York City, and continues to face the multitude of criminal charges set forth in the DA's detailed and lengthy Indictment for Enterprise Corruption and other business frauds.

**B.      Alternatively, This Case Should Be Converted to a
          Proceeding Under Chapter 7 of the Bankruptcy Code**

49.     As an alternate to granting TD Bank lift stay relief to enforce its rights as a secured lender outside of bankruptcy, TD Bank seeks the conversion of this case to a case under Chapter 7.

50.     Section 1112(b) of the Bankruptcy Code provides that upon motion of a party in interest "the court may convert a case under this chapter to a case under chapter 7 of this title . . . for cause" 11 U.S.C. § 1112(b).

51.     The recent amendments to the Section 1112(b)(4) set forth a non-exclusive list of circumstances constituting cause, including

      (A)     substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

      (B)     gross mismanagement of the estate.

52.     The Court simply cannot permit this indicted Debtor to continue to operate in Chapter 11 because doing so will only cause further detriment to the estate and its creditors as

additional and unnecessary costs associated with the Chapter 11 proceeding are incurred. In fact, Debtor's proposed Chapter 11 budget projects that if Debtor is allowed to continue to operate in Chapter 11, it will lose yet another $558,000 between now and the end of August 2009. "Cause", as contemplated by the statute, is therefore plainly present.

53.     The Bankruptcy Code does not require a court to wait any specific period of time before converting a debtor's Chapter 11 case. Where there is no reasonable possibility of an effective reorganization, the bankruptcy court is not compelled to wait a certain period of time, to the detriment of creditors, before ordering conversion of the case." Johnston v. Jem Dev. Co. (In re Johnston), 149 B.R. 158, 162 (9th Cir. B.A.P. 1992). As the Fourth Circuit Court of Appeals has concluded, "[i]t is of course obvious that 'if there is not a potentially viable business in place worth protection and rehabilitation, the Chapter 11 effort has lost its raison d'etre . . .' and the ability of bankruptcy courts to inquire into that critical matter at the very threshold would seem indispensable to proper accomplishment of the basic purposes of Chapter 11 protection." Carolin Corp. v. Miller, 886 F.2d 693, 698 (4th Cir. 1989).

54.     Similarly, the Supreme Court has opined that "[h]owever honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation." Tennessee Publishing Co. v. American Nat'l Bank, 299 U.S. 18, 22 (1936). "[T]here must be a 'reasonable possibility of a successful reorganization within a reasonable time." United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. at 376 (1988). Reorganization of this Debtor simply cannot occur under the circumstances of this case.

55.     The continuing decrease in the value of TD Bank's Collateral, which has already occurred over the six-month period during which the Debtor enjoyed the unfettered use of TD Bank's cash collateral under protection of the TRO issued against TD Bank (and other creditors) in the Forfeiture Action, and the absence of any reasonable hope for a successful reorganization of the Debtor, give more than adequate cause for the conversion of this case to a proceeding under Chapter 7 of the Bankruptcy Code.

56.     There has already been substantial and continuing diminution of the estate, and there is no likelihood of rehabilitation.  Indeed, rehabilitation is not even on the Debtor's radar screen.  This case is a liquidation and the only question is whether the liquidation will be in Chapter 11 or 7.  If lift stay relief is not to be granted, then liquidation of the Debtor's business should proceed forthwith under the supervision of a Chapter 7 trustee.

## III.     REQUEST FOR IMMEDIATE HEARING

57.     Given the rapidly deteriorating status of the Collateral, TD Bank is prepared to immediately present evidence and argument in support of its Motion, and in opposition to the Debtor's Motions at the hearing in this matter schedule for May 15, 2009.

## III.     RESERVATION OF RIGHTS

58.     TD Bank reserves its right to supplement this omnibus brief as necessary, and to call any witnesses, and present any evidence in support of its positions, at any hearing on these matters

# CONCLUSION

59.  As a result of the foregoing, the relief sought by the Debtor should be denied and TD Bank should be granted the relief it seeks herein.

WHEREFORE, for the reasons set forth above, TD Bank prays that this Honorable Court, deny the Debtor any further use of cash collateral, deny the Debtor's Wages Motion, and lift the automatic stay so that TD Bank may foreclose on its liens against the Debtor's assets (or in the alternative, convert this case to a proceeding under Chapter 7 of the Bankruptcy Code), and grant such other, further or different relief as this Court determines to be just and proper.

Dated: New York, New York
      May 14, 2009

Respectfully submitted,

OTTERBOURG, STEINDLER, HOUSTON
  & ROSEN, P.C.

By: _____
    Stanley L. Lane, Jr. (SL8400)
    A Member of the Firm
230 Park Avenue
New York, New York 10169
(212) 661-9100

Attorneys for Plaintiff
TD Bank, N.A. as successor by merger to Commerce Bank, N.A.

Of Counsel:
    Bernard Beitel
    Erik B. Weinick

1286588.1

- 24 -